18. MJ-2461-MBB
18. MJ-2462-MBB

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT, AN ARREST WARRANT, AND A SEARCH WARRANT

I, Mark J. Concannon, being duly sworn, state under oath:

### Introduction and Agent Background

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA") and have been so employed since October 2012.  As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. § 2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code.

2.      In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy.  In 2005, I graduated from the Massachusetts State Police Academy.  I have been a police officer since 2005.  As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action Team in the city of Brockton working in a high-crime area focusing on gang and drug activity.  In October of 2012, I was assigned to the Division of Investigative Service and to the DEA working as a TFO in the Boston Tactical Diversion Squad.  Since the spring of 2017, I have been assigned to the DEA Boston Strike Force located in Watertown, Massachusetts.

3.      I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell.  I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.     During my time as a police officer and TFO, I have participated in numerous

investigations and arrests involving violations of state and federal controlled substances laws,

including Title 21, United States Code, Sections 841(a)(1) and 846.  A number of those

investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or

other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal

property.  My investigations have included the use of surveillance techniques, tracking warrants,

and the execution of search, seizure, and arrest warrants.  I have participated in various aspects

of narcotics investigations, including controlled and undercover purchases.  I have also

participated in joint investigations with the DEA, Federal Bureau of Investigation ("FBI"), and

numerous state and local agencies.  Based on my training and experience, I am familiar with the

appearance, packaging, texture, and smell of many controlled substances.

5.     As a result of my training and experience, I am familiar with the methods,

routines, and practices of individuals involved in the use, sale and trafficking of narcotics.  I am

also familiar with the various paraphernalia used to manufacture, compound, process, deliver,

and dispense, import and export, and use controlled substances such as methamphetamine,

fentanyl, heroin, cocaine, marijuana, prescription medications, and others.  I have debriefed

numerous defendants, informants, and witnesses who have had personal knowledge about drug

activities and the operation of drug trafficking organizations.  I have sworn out numerous

affidavits in support of search warrants, arrest warrants, and other Court applications.

6.     I submit this affidavit in support of the following:

    a.  An application for the issuance of a criminal complaint charging Snolbert

       RAMIREZ-SANDOVAL, a/k/a NEW YORK ("RAMIREZ-

       SANDOVAL") with distribution of N-phenyl-N-[1-(2-phenylethyl)-4-

2

piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled

substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.  An application for the issuance of a search warrant authorizing the search

of 4347 Washington Street, Apartment 6, Roslindale, Massachusetts,

02131 (hereinafter, "the TARGET LOCATION").  A complete description

of the TARGET LOCATION is set forth in Exhibit A, which is attached

hereto and incorporated herein.

7.      As described below, on two separate occasions, RAMIREZ-SANDOVAL sold a

total of 30 grams of fentanyl to a cooperating source ("CS-1"), who was acting under law

enforcement supervision.  Both of these transactions occurred within the last two weeks, and

both were audio- and/or video-recorded.  In both instances, the drugs were field tested with

positive results for fentanyl.  Both of the drug transactions occurred within the TARGET

LOCATION.  According to records obtained from Eversource, a utilities provider, the utilities

for the TARGET LOCATION have been registered in the name of Reymo E. Mendez since

April 25, 2018, with a contact telephone number of (978) 273-3942 (who, as described below,

has been identified as a cousin of RAMIREZ-SANDOVAL).

8.      For the reasons set forth below, I submit that there is probable cause to believe

that the TARGET LOCATION contains records and other evidence of the following offenses:

(a) possession with intent to distribute and/or distribution of controlled substances, including

fentanyl, in violation of 21 U.S.C. § 841(a)(1); and (b) conspiracy to possess with intent to

distribute and/or distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively,

"the TARGET OFFENSES").  More specifically, as will be discussed below, I submit that there

is probable cause to believe that at the TARGET LOCATION (described in Attachment A) there

will be the items listed in Attachment B, that is, evidence of the commission of a criminal offense or evidence which is contraband, the fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use or which is or has been used as the means of committing an offense in violation of the TARGET OFFENSES.

9.     I have personally participated in the investigation of RAMIREZ-SANDOVAL since July 2018. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of precise location information for a telephone used by RAMIREZ-SANDOVAL; (c) information provided to me orally and in writing by other law enforcement agencies; (d) my experience and training as a criminal investigator.

10.     Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that RAMIREZ-SANDOVAL has engaged in the possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and that evidence of criminal activity involving the TARGET OFFENSES is located at the TARGET LOCATION, I have not included each and every fact known to myself and other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint and search warrant. Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested warrant. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

4

**Background**

11.     Since approximately the beginning of July 2018, the DEA Boston Strike Force has been investigating RAMIREZ-SANDOVAL, a heroin and fentanyl source of supply who is distributing in the area of Boston, Massachusetts.

12.     Investigators obtained information about RAMIREZ-SANDOVAL from a Massachusetts State Police confidential source (hereinafter, "CS-1").  I am aware of the true name of CS-1, but am not publicly disclosing it at this time in order to protect CS-1 from retaliation and because public disclosure at this time might jeopardize the ongoing investigation. CS-1 is not willing to testify out of fear of retribution to CS-1 and CS-1's family.  CS-1 was previously arrested for distribution of controlled substances, but those charges were dismissed.  I am also aware that CS-1 is not a citizen of the United States, and is working with the Massachusetts State Police for both monetary compensation and in the hopes of receiving consideration regarding his immigration status.

13.     In March 2017, CS-1 worked as a confidential source for the Quincy Police Department and the DEA in Boston during an investigation in which I was involved.  In the course of that investigation, CS-1 provided information about an individual selling large amounts of heroin and fentanyl in Massachusetts.  CS-1 conducted multiple controlled buys that resulted in the seizure of approximately 120 grams of heroin and fentanyl from the target of that investigation.  CS-1 has worked as a Massachusetts State Police confidential source for approximately one month.  As described below, CS-1 conducted one controlled buy (consisting of approximately ten grams of fentanyl) from RAMIREZ-SANDOVAL's drug trafficking organization ("DTO") on July 26, 2018, and a second controlled buy (consisting of approximately twenty grams of fentanyl) from RAMIREZ-SANDOVAL's DTO on August 2,

2018. The information provided by CS-1 has been corroborated to the extent possible through surveillance, audio and video recordings of the controlled buys, and recorded telephone conversations between CS-1 and RAMIREZ-SANDOVAL. These recordings further corroborate the information provided by CS-1, and information provided by CS-1 is believed to be reliable.

14.     On July 9, 2018, investigators met with CS-1 concerning a light-skinned male from the Dominican Republic known to CS-1 as "Johnathan" and "NEW YORK." CS-1 described NEW YORK (as set forth below, CS-1 subsequently identified NEW YORK as RAMIREZ-SANDOVAL) as approximately 25 years of age and the head of a DTO operating in Roslindale, Massachusetts. According to CS-1, RAMIREZ-SANDOVAL currently sells heroin and fentanyl and intends to sell kilogram-level quantities of those drugs. CS-1 also told investigators that RAMIREZ-SANDOVAL wants to be a source of supply of narcotics for CS-1; specifically, that CS-1 could purchase heroin and/or fentanyl from RAMIREZ-SANDOVAL, and that RAMIREZ-SANDOVAL was utilizing telephone number (339) 226-1789 to communicate with CS-1 regarding drug distribution. Further, CS-1 told investigators that RAMIREZ-SANDOVAL stored his narcotics in an apartment on Washington Street in Roslindale, Massachusetts; that the apartment appeared to be largely empty; and that CS-1 had previously seen a scale in the kitchen there. Based on my training and experience, I know that drug dealers often use scales to weigh out drug quantities for sale.

15.     During the course of our meeting with CS-1, I asked if CS-1 could obtain a drug sample from the DTO. CS-1 then handed me a small, knotted clear plastic baggie containing brown powder. According to CS-1, CS-1 had met with RAMIREZ-SANDOVAL just prior to our meeting, that CS-1 offered the baggie to CS-1, and that CS-1 could not have refused to take

6

the sample without arousing RAMIREZ-SANDOVAL's suspicion.  CS-1 was instructed to not

accept additional drugs in the future unless directed to do so by law enforcement.  I subsequently

field tested the brown powder; the field test indicated the presence of fentanyl.

16.     During the week of July 13, 2018, CS-1 told me that RAMIREZ-SANDOVAL

had changed the cellular telephone number he was using to conduct his drug distribution

activities from (339) 226-1789 to the (617) 708-7030 (hereinafter, "the 7030 TELEPHONE").

CS-1 also explained that RAMIREZ-SANDOVAL had drugs available for sale and was anxious

to sell drugs to CS-1.

17.     On July 31, 2018, the Honorable Marianne B. Bowler, United States Magistrate

Judge, signed a warrant authorizing investigators to obtain precise location information for the

7030 TELEPHONE.  *See* 18-MJ-2453-MBB (*under seal*).

18.     On August 3, 2018, the Honorable David H. Hennessy, United States Chief

Magistrate Judge, signed a warrant authorizing the installation and use of a pen register and trap

and trace device on the 7030 TELEPHONE.  *See* 18-MJ-4248-DHH (*under seal*).

**Probable Cause**

July 26, 2018: RAMIREZ-SANDOVAL Arranged for the Sale of 10 Grams of Fentanyl to CS-1
at the TARGET LOCATION.

19.     Based   on   CS-1's   prior   communications   with   RAMIREZ-SANDOVAL,

investigators directed CS-1 to conduct a controlled buy of fentanyl from RAMIREZ-

SANDOVAL.  CS-1 told investigators that he had contacted RAMIREZ-SANDOVAL on the 7030

TELEPHONE prior to meeting with investigators to arrange the drug buy for July 26, 2018.  That

call was not recorded.  According to CS-1, during that communication RAMIREZ-SANDOVAL

directed CS-1 to go to the TARGET LOCATION (4347 Washington Street, Apartment 6, in

Roslindale, Massachusetts), to purchase the drugs. RAMIREZ-SANDOVAL told CS-1 that a "lady" would be there with the drugs.

20.     At approximately 11:20 a.m. on July 26, 2018, CS-1 met with investigators at a pre-determined location. Investigators searched CS-1 and CS-1's vehicle for excessive amounts of United States currency and contraband. Neither was found. Investigators gave CS-1 $600 in Strike Force funds with which to purchase the drugs. For safety reasons, CS-1 was also equipped with a KEL monitoring device that makes and transmits audio and video recordings. I have since reviewed those audio and video recordings, and, based on my training and experience, I believe those recordings corroborate CS-1's description of the controlled buy set forth below.

21.     At approximately 11:45 p.m. that same day, surveillance officers followed CS-1 from the meeting location to the area of 4343 Washington Street in Roslindale, Massachusetts. CS-1 parked near 4347 Washington Street, exited the vehicle, entered the courtyard of an apartment complex, and walked to a glass door labeled 4347, located at the back right corner of the apartment complex. CS-1 then rang the buzzer labeled "Apt. #6 TARBAL" (the second from the top on an eight-button keypad). Shortly thereafter, someone in the apartment unlocked the door remotely, and CS-1 walked upstairs to apartment number 6 (the TARGET LOCATION).

22.     Once inside the apartment, CS-1 was greeted by two juvenile males. One of the juveniles appeared to be approximately 11-14 years old while the other appeared to be between 3-6 years old. The older juvenile told CS-1, "The man is not here," and that the "stuff" was in the room in a drawer. CS-1 then walked to a room on the right-hand side of the apartment; inside, CS-1 observed a chest of drawers. CS-1 opened one of the drawers and located a purple rubber glove containing a powdery substance wrapped in a plastic baggie. CS-1 gave the juvenile money as payment for the substance. According to CS-1, the room was empty and did not appear to be

used frequently.

23.     At approximately 12:11 p.m., CS-1 exited the apartment, returned to CS-1's vehicle, and left the area.  Investigators kept CS-1 under constant surveillance as they followed CS-1 back to the pre-determined meeting location.  Once there, CS-1 handed me the purple plastic glove.  Inside of the glove was a knotted cellophane baggie that contained an off-white powdery substance.  Based on my training and experience, I believed the powdery substance contained fentanyl.  CS-1 and CS-1's vehicle were searched for additional currency and contraband.  Neither was found.  On July 30, 2018, I conducted a field test on the powdery substance from the baggie, and the field test indicated the presence of fentanyl.

### July 30-31, 2018: CS-1 Contacted RAMIREZ-SANDOVAL on the 7030 TELEPHONE to Arrange to Buy 20 Grams of Fentanyl on July 31, 2018.

24.     On July 30, 2018, at approximately 5:39 p.m., CS-1 used CS-1's telephone to call RAMIREZ-SANDOVAL on the 7030 TELEPHONE while using a device that made an audio recording of their conversation.  I have reviewed a translation of that conversation, in which CS-1 and RAMIREZ-SANDOVAL stated in relevant part:

| | |
|---|---|
| CS-1: | If I could see you tomorrow for twenty pesos? |
| RAMIREZ-SANDOVAL: | I'm waiting on the bus that arrives today.  There was something left there, but it seemed . . . I gave [it] to a person and it wasn't too good. |
| . . . | |
| RAMIREZ-SANDOVAL: | I will call you . . . Give me two hours to call you. |
| CS-1: | It needs to be the same stuff.  You get me?! |
| . . . | |
| CS-1: | Twenty pesos.  You heard?!  I'll be there at like 3:00 in the afternoon. |
| RAMIREZ-SANDOVAL: | Alright. |

9

25.     Based on my training, experience, and familiarity with this investigation, I believe that CS-1 asked RAMIREZ-SANDOVAL to sell CS-1 an additional twenty grams of fentanyl ("twenty pesos") on July 31, 2018 ("tomorrow"); that RAMIREZ-SANDOVAL was waiting for additional drugs to arrive on July 30, 2018 ("I'm waiting on the bus that arrives today"); that RAMIREZ-SANDOVAL wanted to wait for the new supply because what he had available was not of high-quality ("There was something left . . . and it wasn't too good"); that CS-1 insisted on the same quality that he had previously purchased ("It needs to be the same stuff.  You get me?!"); and CS-1 re-confirmed that he wanted to purchase 20 grams ("Twenty pesos.  You heard?!").  Based on the foregoing, there is probable cause to believe that RAMIREZ-SANDOVAL is using the 7030 TELEPHONE to coordinate drug trafficking activities.

July 31, 2018: Identification of NEW YORK as Snolbert RAMIREZ-SANDOVAL

26.     On July 31, 2018, investigators displayed two photo arrays to CS-1.  Prior to showing CS-1 the photo arrays, an investigator read CS-1 the instructions regarding the presentation of the photo array to CS-1 verbatim; CS-1 acknowledged understanding those instructions.  The investigator presented each of the eight photos in Photo Array #1 to CS-1 one at a time and in sequential order.  Upon viewing each photo individually, CS-1 identified photograph #4 as that of an individual known to CS-1 as NEW YORK.  Photograph #4 is of Snolbert RAMIREZ-SANDOVAL.  Based on information obtained from the Massachusetts Registry of Motor Vehicles, RAMIREZ-SANDOVAL provided 92 Maple Street, Apartment #3, Dorchester, Massachusetts, 02121 as both his residential and mailing address.  RAMIREZ-SANDOVAL is a male born in 1997.  Based on my review of RAMIREZ-SANDOVAL's criminal record, I understand that in September 2016, he was charged in Roxbury District Court (state court) with distribution of a class A controlled substance.  In September 2017, RAMIREZ-SANDOVAL

admitted to sufficient facts for that offense and was placed on probation for a year before the charge was dismissed. RAMIREZ-SANDOVAL was also charged with in Roxbury District Court with trafficking heroin in September 2016; the prosecutors in that case filed a nolle prosequi in December 2016.

27.     Based on precise location information obtained from the 7030 TELEPHONE, the location of the telephone at night is consistently in the vicinity of Lee Hill Road, Roslindale, Massachusetts, 02121, with a radius of 1,283 meters. Lee Hill Road in Roslindale is approximately 0.5 miles to the TARGET LOCATION.

### August 2, 2018: RAMIREZ-SANDOVAL Sold CS-1 Twenty Grams of Fentanyl at the TARGET LOCATION

28.     On August 2, 2018, starting in morning hours, CS-1 contacted RAMIREZ-SANDOVAL on the 7030 TELEPHONE to arrange a narcotics transaction for later that day. Those telephone conversations were recorded with CS-1's consent. In the course of those telephone conversations, CS-1 asked RAMIREZ-SANDOVAL to sell him an additional 20 grams of fentanyl. RAMIREZ-SANDOVAL agreed to do so, and later in the day instructed CS-1 to go to the TARGET LOCATION to meet to pick up the drugs at 5:00 p.m. on August 2, 2018.

29.     At approximately 3:00 p.m., CS-1 arrived at the pre-determined meet location. I and other investigators searched CS-1 and CS-1's vehicle for excessive amounts of U.S. currency and contraband; neither were found. Other investigators established surveillance in the area of 4347 Washington Street, Roslindale, Massachusetts (the vicinity of the TARGET LOCATION). CS-1 was given $1,000 in government funds for the purchase of the twenty grams of fentanyl. CS-1 was also equipped with a KEL monitoring device that transmits and records audio and video for the protection of CS-1.

30.     At approximately 5:45 p.m., CS-1 left the meet location. Surveillance officers

followed CS-1's vehicle; at approximately 5:50 p.m., CS-1 parked the CS-1 vehicle on the corner

of Durnell Avenue and Washington Street in Roslindale, Massachusetts.  CS-1 then exited the

vehicle and walked toward 4347 Washington Street.  CS-1 walked across the courtyard toward the

back right corner and approached a glass door labeled "4347."  CS-1 then rang the second buzzer

from the top on an eight-button keypad, labeled "Apt. #6 TARBAL."  At approximately 5:55 p.m.,

someone remotely unlocked the front door for 4347 Washington Street, and CS-1 proceeded

upstairs to apartment number six.  Once inside, CS-1 was again greeted by the same two juvenile

males CS-1 had encountered during the previous controlled buy.  One male appeared to be between

11-14 years of age and the other male appeared to be between three to six years of age.  The older

juvenile told CS-1 that, "The man is not here."  At approximately 5:58 p.m., CS-1 received a call

from RAMIREZ-SANDOVAL stating he would "be there shortly."  That telephone call was also

recorded.  At approximately 6:15 p.m., surveillance officers observed a white Toyota Highlander

park on Washington Street in front of building 4347 Washington Street.  Surveillance officers then

observed two Latino males exit from the Highlander; one of the males was identified as

RAMIREZ-SANDOVAL.  At approximately 6:20 p.m., RAMIREZ-SANDOVAL and the

unidentified male with him entered into the door of 4347 Washington Street and proceeded up the

stairs to the second floor to the TARGET LOCATION.

31.     Once inside the kitchen of the apartment, CS-1 engaged further social conversation

with RAMIREZ-SANDOVAL.  At approximately 6:29 p.m., the unidentified male provided

RAMIREZ-SANDOVAL with a clear, knotted baggie twist containing white powder; RAMIREZ-

SANDOVAL then handed it to CS-1.  CS-1 paid for it with the $1,000 in United States currency

previously provided to CS-1 by investigators.  RAMIREZ-SANDOVAL advised CS-1 to add

"Two points to that."  Based on my training and experience, I believe RAMIREZ-SANDOVAL

told CS-1 to add a cutting agent to dilute the narcotics because of their potency.  The exchange of the baggie for money with RAMIREZ-SANDOVAL and the statements made by RAMIREZ-SANDOVAL were audio and video recorded.

32.     At approximately 6:33 p.m., CS-1 left the TARGET LOCATION and returned back to the CS-1 vehicle.  Investigators kept the CS-1 vehicle under constant surveillance for the drive back to the meet location.

33.     Once back at the meet location, CS-1 handed me the clear, knotted baggie twist containing white powder.  Based on my training and experience and the color and appearance of the substance, I suspected the substance was fentanyl.  CS-1 told investigators to be careful with the substance because it was "venom"; based on my training, experience, and familiarity with this case, I understood that to mean that the drugs were potent.  Both CS-1 and the CS-1 vehicle were searched for currency and contraband; neither was found.

34.     The substance in the clear, knotted baggie twist obtained by CS-1 from RAMIREZ-SANDOVAL was field tested, and tested positive for fentanyl.

35.     Based on precise location information for the 7030 TELEPHONE, the telephone was in a location consistent with the TARGET LOCATION throughout the duration of CS-1's interaction with RAMIREZ-SANDOVAL there.  After CS-1 left the TARGET LOCATION, officers conducting physical surveillance observed RAMIREZ-SANDOVAL leave the TARGET LOCATION.  Shortly thereafter, precise location information from the 7030 TELEPHONE showed that the telephone had also left the location.

Evidence of RAMIREZ-SANDOVAL's Connection to the TARGET LOCATION

36.     In addition to the two drug transactions that occurred at the TARGET LOCATION arranged by RAMIREZ-SANDOVAL, RAMIREZ-SANDOVAL has further

13

connections to the TARGET LOCATION.

37.     As described above, the utilities for the TARGET LOCATION have been subscribed to Reymo E. Mendez since April 25, 2018, with a contact telephone number of (978) 273-3942.

38.     On July 31, 2018, investigators displayed two photo arrays to CS-1.  Prior to showing CS-1 the photo arrays, an investigator read CS-1 the instructions regarding the presentation of the photo array verbatim to CS-1; CS-1 acknowledged understanding those instructions.  The investigator presented each of the eight photos in Photo Array #2 to CS-1 one at a time and in sequential order.  Upon viewing each photo individually, CS-1 identified photograph #2 as that of an individual known to CS-1 as the cousin of RAMIREZ-SANDOVAL. Photograph #2 is of Reymo Mendez, the listed account holder for utilities at the TARGET LOCATION (4347 Washington Street, Apartment #6, Roslindale, Massachusetts 02131).

39.     In addition, on August 6, 2018, I reviewed toll records for the 7030 TELEPHONE going back to July 10, 2018, and determined that within that period, the 7030 TELEPHONE had five contacts with (978) 273-3942 (listed as a contact telephone number for Reymo E. Mendez on April 25, 2018).

**Probable Cause to Believe That Evidence, Fruits, and Instrumentalities of the TARGET OFFENSES Above Will Be Found at the TARGET LOCATION**

40.     As described above, I believe that RAMIREZ-SANDOVAL is actively engaged in the distribution of drugs, specifically fentanyl, and that he uses the TARGET LOCATION to facilitate that distribution.  Based on my training and experience, I believe probable cause exists that the TARGET LOCATION, as described in Attachment A, will contain evidence, fruits, and instrumentalities of the TARGET OFFENSES, as described in Attachment B.

41.     The TARGET LOCATION is located at 4347 Washington Street, Apartment 6,

Roslindale, Massachusetts, 02131.   4347 Washington Street in Roslindale, Massachusetts, is a multi-story residential structure with an exterior consisting of red bricks with white trim.   The main entrance to the building, shared by approximately eight apartments, is a glass door located at the back right-hand corner of the courtyard of the apartment complex.   The entrance system at the front of 4347 Washington Street for apartment number six is labeled, "Apt. #6 TARBAL."   The number "4347" is affixed to the glass door.   The TARGET LOCATION (the location to be searched) is an apartment on the second floor.   The doorway to the TARGET LOCATION is white with green trim and bears a black number "6."

42.     Based on my training and experience, I know that individuals involved in drug trafficking require secure locations, often known as "stash houses," from which to operate.   Here, based on my familiarity with this investigation, my training and experience, and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at such locations, I believe that RAMIREZ-SANDOVAL uses the TARGET LOCATION as a stash house at which to store drugs, to prepare drugs for distribution, to keep paraphernalia and documents necessary to conduct drug trafficking operations safe yet accessible, and to conduct distribution transactions with customers.

43.     Based on my training and experience, including participation in other drug investigations and extensive discussions with other law enforcement officials experienced in narcotics investigations, I am also aware that it is common practice for drug traffickers to store drug-related paraphernalia and records in secure locations such as their residences, places of business, and stash houses for longer periods of time than they keep drugs.   I have participated in the execution of numerous search warrants of the residences and/or stash houses of drug traffickers whose criminal activity is similar to that of RAMIREZ-SANDOVAL.   In a substantial number of

searches executed in connection with the drug investigations in which I have been involved, investigators typically recover drug-related evidence including cash, records, drug distribution materials, drugs, and other valuable items.  Based on my training and experience, I believe that:

a.  Drug traffickers generally store their drug inventory, drug paraphernalia, drug proceeds, and drug records at or in their residences, businesses, drug stash houses, and/or vehicles;

b.  Drug traffickers will also generally seek to store their drug inventory, drug paraphernalia, drug proceeds, and drug records in the residences, businesses, and/or vehicles of relatives, trusted associates, or others in an effort to distance themselves from the drugs they are selling and to shield themselves from detection by law enforcement, or by setting up what is commonly referred to as a "stash house," typically a residence or commercial location registered in the name of others and used to store drugs or to prepare drugs for distribution;

c.  Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts.  As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. Further, since drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, body armor,

16

firearm cleaning kits, scopes, holsters and other dangerous weapons for

extended periods of time in convenient and safe locations such as their

residences, businesses, stash houses, on their persons and in their vehicles;

d.  Drug traffickers often find it necessary to store large sums of cash

received from the sale and distribution of controlled substances outside of

the normal banking system.  Accordingly, drug traffickers frequently

maintain large amounts of cash and other valuable assets at their

residences, businesses, stash houses, or vehicles, in order to maintain and

finance their ongoing business, and often keep one or more currency

counting machines to aid in counting drug proceeds.  Drug traffickers also

often make use of wire transfers, cashier's checks, and money orders to

pay for controlled substances.  Evidence of such financial transactions and

records relating to income and expenditures of money and wealth in

connection with drug trafficking and money laundering is also generally

maintained in the residences, businesses, stash houses or vehicles of those

involved in selling drugs or their relatives or trusted associates;

e.  Drug traffickers frequently maintain books, records, receipts, notes,

ledgers, airline tickets, money orders, emails, and other documents

relating to the transportation, ordering, sale and distribution of controlled

substances, and monetary instruments and other assets, and to debts and

collections relating to monies owed or due for the distribution of

controlled substances; and documents relating to the transportation of

controlled substances, such as travel itineraries, plane tickets, boarding

17

passes, motel and hotel receipts, passport and visas, and credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the drug traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

f.   It is common for drug dealers to secrete records of drug transactions in secure location within their cell phones, computers, residences, businesses,

18

and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

g.  It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to income from controlled substances and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, drug stash locations, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

h.  Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cellular telephone(s). They also tend to maintain for long periods of time telephone billing records

19

that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

i.   Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on the cellular telephone(s) and other electronic devices;

j.   Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residences or stash houses;

k.   Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

l.   Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

m. Drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of

20

these cellular telephones are kept at residences or drug stash houses.
Moreover, the particular numbers of and the particular numbers dialed by
particular cellular telephones can be evidence of drug trafficking,
particularly in a case involving the interception of communications
between drug traffickers. Such numbers can confirm identities of
particular speakers and the occurrence of certain events. It is common for
these cellular telephones to be retained, although not necessarily used, for
months or longer by drug traffickers in their vehicles, residences, and
businesses. Drug traffickers often do not discard their cellular telephones
immediately after they stop actively using them. Therefore, while it is
common for drug traffickers to stop using cellular telephones frequently, it
is far less common for drug traffickers to discard their cellular telephones
after they switch to new cellular telephones. As a result, I am aware that
collections of cell phones have been found during drug trafficking search
warrants of stash houses or residences that have included cell phones that
were no longer being used by a particular drug trafficker but had
nevertheless been retained;

n.  Drug traffickers often attempt to launder/legitimize the proceeds of illicit
drug distribution and to otherwise conceal such proceeds from discovery
by law enforcement. To do so, drug traffickers often place assets, such as
vehicles and residences, in the names of other persons to conceal their true
ownership and the manner in which they were acquired. Records
reflecting the implementation of such deceptive practices, such as deeds,

21

titles, and service records, are likely to be found either inside the

residence, stash houses, businesses, or vehicle of the drug trafficker or

inside the residence, business, or vehicle of the person in whose name the

asset is listed.

44.    Based on my training and experience, I know that drug traffickers commonly use

cellular telephones and/or smartphones to communicate about and further their drug trafficking

activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently

change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as

prepaid cellular phones (where the subscriber of the phone is not required to provide personal

identifying information), in an effort to thwart law enforcement's use of electronic surveillance.

Based on my training and experience, drug traffickers often use multiple phones and change their

phone numbers frequently to avoid law enforcement detection.  A cellular telephone is a handheld

wireless device used for voice and text communication as well as for accessing the internet.

Telephones send signals through networks of transmitter/receivers called "cells," enabling

communication with other wireless telephones or traditional "land line" telephones.  A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of

calls and text messages made to and from the phone.    In addition to enabling voice

communications, wireless telephones now offer a broad range of capabilities.  These capabilities

include, but are not limited to: storing names and phone numbers in electronic "address books;"

sending, receiving, and storing text messages and email; taking, sending, receiving, and storing

still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading

information from the Internet, including electronic mail ("email"), iMessages, Facebook

Messages, and other forms of electronic communications. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

45.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones and mobile phones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

46.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that electronic files or remnants of such files can be recovered from smartphones and mobile phones months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

> a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their telephones, they can easily transfer the data from their old telephone to their new telephone.
>
> b.  Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a

23

file on a telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, storage media—in particular, internal hard drives—contain electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

47.     Based on all of the information that I have obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe that RAMIREZ-SANDOVAL uses the TARGET LOCATION to store drugs, documents, paraphernalia, and the cash proceeds of his drug distribution business. I believe that drugs, cash, owe sheets, and other documents regarding those activities will be found in the TARGET LOCATION. Finally, I also believe that RAMIREZ-SANDOVAL use his smartphones and/or telephones to facilitate the TARGET OFFENSES, to communicate with drug suppliers, with customers, and with co-conspirators, and that communications, records, appointments and other information will be found on their smartphones/telephones, and that their smartphones/telephones will be found on or near RAMIREZ-SANDOVAL. *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence

24

**Request to Seal**

48.     Because they reveal the existence of an ongoing investigation, I request that the warrant, this affidavit, and the accompanying applications in support thereof be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants.

**CONCLUSION**

49.     Based on the information described above, together with my training and experience, I submit that there is probable cause to believe that RAMIREZ-SANDOVAL distributed fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a). Accordingly, I respectfully request that both a criminal complaint and an arrest warrant be issued.

50.     Based on the information described above, together with my training and experience, I further submit that there is probable cause to believe that at the TARGET LOCATION, as described in Attachment A, there exists evidence, fruits, and instrumentalities of

---

of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two year-old information relating to marijuana operation not stale)). As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

RAMIREZ-SANDOVAL's drug trafficking activities in violation of the TARGET OFFENSES as set forth in Attachment B. Accordingly, I respectfully request that a search warrant be issued for the search of the premises described in Attachment A for the items detailed in Attachment B.

51.     Disclosure of the contents of this application, affidavit, and search warrant could compromise and jeopardize the ongoing investigation. For that reason, I request that the application and search warrant be sealed until further order of the Court.

Respectfully submitted,

Mark J. Concannon
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 7 day of August, 2018

Hon. Marianne B. Bowler
United States Magistrate Judge